IN RE SMITH'S ESTATE
NAAB ET AL. v. SMITH

(No. 2130; January 9, 1940; 97 Pac. (2d) 677)

For the plaintiffs in error, there was a brief by *E. W. Naab* and *W. A. Muir* of Rock Springs, and oral argument by *Mr. Naab*.

For the defendant in error, there was a brief by *Lewis H. Brown* of Rock Springs, Wyoming, and *Van Cise, Robinson & Charlton* and *Robert D. Charlton* of Denver, Colorado, and oral arguments by *Messrs. Brown* and *Charlton.*

BLUME, Justice.

Jean Poston was formerly married to one Frank J. Poston, resident of this state. The latter died in this state on November 11, 1925, leaving Jean Poston and their four children as heirs. On November 18, 1927, she made her last will and testament, disposing of her property so inherited to her four children. The will was executed at Rock Springs, in this state, where it was left. The next day she married Anthony Wayne Smith, a resident of Denver, Colorado, and she and her children moved with him to his residence where they continued to reside until her death at that place on October 4th, 1938. W. A. Muir, one of the executors appointed in the will, filed the will in the district court of Sweetwater county in this state, praying that the will be admitted to probate. She left property in this

state, consisting of real property and a bank deposit in the Rock Springs National Bank, in this state, in the amount of about $22,000. Anthony Wayne Smith, herein called the objector, filed objections to the probate of the will, on the ground that the deceased died a resident of Colorado; that under the law of that state the last will and testament of a person is revoked by subsequent marriage alone, and that that is also true under the laws of this state, namely, under section 88-105, Rev. St. 1931, which, after providing for specific methods of revoking a will, further provides that "nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator." The trial court, finding that the will was duly executed according to the laws of this state, also found that it had been revoked under the clause just quoted, and refused to admit the will to probate for that reason. The petitioner for probate, and the guardian ad litem for the minor children, have appealed from that decision.

1. It is the contention of counsel for the objector that the will of the deceased was revoked by her subsequent marriage, and they believe that we indicated that to be the rule in Johnston v. Laird, 48 Wyo. 532, 52 P. (2d) 1219. That case involved the will of a man. What we said about a woman's will was but incidental. We made no reference, or scant reference, to the many cases directly bearing on such will, and it would seem that we should scarcely have failed to do so, if we had meant to express our opinion thereon. We mentioned the fact that husband and wife stand on an equal footing under modern laws and conditions, and that, accordingly, if a woman's will were held to be revoked by subsequent marriage alone, it would be just as urgent to hold that to be the rule in the case of a man's will. And we cited some cases so holding. If we had

adopted the rule of those cases, that would have furnished good ground for analogical reasoning in this case. But we did not do so, but rested the decision of that case upon different grounds. We think, accordingly, that Johnston v. Laird furnishes no authority for the case at bar, and that we are free to consider this case as one of first impression.

At common law, the will of a woman was ordinarily revoked by her subsequent marriage. 68 C. J. 831. That was first held in Forse and Hembling's Case, 4 Coke 60 b, 76 Eng. Repr. 1022, decided about 1588. The reasons for that seem to have been sufficient at that time. A will is in its nature ambulatory; that is to say, it is revocable up to the time of the death of the person making it. If that ambulatory nature is taken away, its essence is destroyed, and with it the whole will. At common law, a woman's legal existence was to a large extent merged in that of her husband. He became entitled, upon marriage, to an interest in her property real and personal, and in part at least, had full control thereof. 30 C. J. 526, 530; 68 C. J. 419, 420. The wife, losing the absolute power of disposition thereof, lost power to do with her previous will as she wished, and the latter was, accordingly, held to be revoked by her marriage. Ashhurst, J., in Doe v. Staple, 2 T. R. 684, 100 Eng. Rep. 368, 375 (1788), stated that "the marriage must have that operation, because a will supposes a disposing power at the time in the person making it, and that it shall be always afterwards subject to his control; but that is not the case with a woman after coverture; for when she enters in that engagement, she gives up the right to her own property."

Under section 88-101, Rev. St. 1931, any person of full age and sound mind may, with certain exceptions, dispose of his or her property by will. Under section 69-104 "any woman may, while married, make a will

the same as though she were sole." Under section 69-101 all the property which a woman has at the time of her marriage and all the property which she acquires during her marriage from any person by descent or otherwise, remains her separate property notwithstanding her marriage, and under her sole control. In fact, substantially all her disabilities at common law have disappeared, and she has been placed on substantially the same footing with her husband. It is a maxim of the common law that when the reason of a rule ceases, the rule itself should cease. 11 C. J. 224. It would seem to be clear that this maxim should be applied in connection with the rule of the common law now under discussion. It is true that our statutes do not in so many words repeal the rule that a woman's will is not revoked by subsequent marriage alone. But that is the effect. The premises upon which the common law rule was built is destroyed. We must build upon new premises. As we stated in Rhinehart v. Rhinehart, 52 Wyo. 363, 380, 75 P. (2d) 390:

"Constantly aiming as the law does at ideal justice, it cannot, in the absence of a positive legislative rule to the contrary, ignore changed conditions and proceed from premises which are no longer sound. The only doubt which can arise in such case is as to whether or not, in view of the desirability of the certainty of legal rules, the change is sufficiently marked as to justify a departure from a former rule. If such conditions have clearly and markedly changed, the law must proceed from new premises consistent with the changes. Hence decisions founded upon the assumption that a wife is under the dominance of her husband, when that assumption is unrelated to present day realties, 'ought not to be permitted to prescribe a rule of life.' "

Accordingly, most of the modern cases which have passed upon the point have held that under statutes similar to ours, the common law rule above mentioned must be held to be abolished and that a woman's will is not, any more than a man's will, revoked by subse-

quent marriage alone. 68 C. J. 839; Chapman v. Dismer, 14 App. D. C. 446; In re Tuller's Will, 79 Ill. 99, 22 Am. R. 164; Hastings v. Day, 130 N. W. 134, 151 Iowa 39; In re Hunt's Will, 81 Me. 275, 17 Atl. 68; Roane v. Hollingshead, 76 Md. 369, 25 Atl. 307; Noyes v. Southworth, 55 Mich. 173, 20 N. W. 891; Durfee v. Risch, 142 Mich. 504, 105 N. W. 1114; Kelly v. Stevenson, 85 Minn. 247, 88 N. W. 739; Lee v. Blewett, 116 Miss. 341, 77 So. 147; Morey v. Sohier, 63 N. H. 507, 3 Atl. 636; Fellows v. Allen, 60 N. H. 439, 49 Am. Rep. 328; Webb v. Jones, 36 N. J. Eq. 163; Morton v. Onion, 45 Vt. 145; In re Lyon's Will, 71 N. W. 362, 96 Wis. 339; Ward's Will, 35 N. W. 731, 70 Wis. 251.

Moreover, the common-law rule that subsequent marriage alone of a woman revoked her will was not absolute. 68 C. J. 831. She was able to execute a power granted her, whether she was single or married. 49 C. J. 1250. If power of disposing of her property had been granted by a previous owner, for example her ancestor, marriage did not interfere with the exercise of that power, unless by special limitation. 49 C. J. 1279; Sugden on Powers (3rd Am. Ed.) 182. She was able to dispose of her own property pursuant to a power granted her by an antenuptial contract with her intended husband. His agreement conferring the power was in effect, we take it, a release of his future interest in the property to the extent of the power granted, and as such was binding upon him. 68 C. J. 831; Peacock v. Monk, 2 Ves. Sr. 190, 28 Eng. Repr. 123; see note 76 Eng. Repr. 1024. By 34 and 35 Statutes of Henry VIII, Ch. 5, section 14, a married woman was forbidden to convey real estate, and at law, this statute was held to be binding. George v. Jew, Amb. 628, 27 Eng. Repr. 406 (1764). But the rule was different in equity, if the disposition of the property was pursuant to an antenuptial agreement. Wright v. Englefield, Amb. 468, 27 Eng. Repr. 308 (1764) ; Rippon v. Dawd-

ing, Amb. 565, 27 Eng. Repr. 363; note 76 Eng. Repr. 1024. The power was required to be exercised according to its terms. Thus it was held that a power which was to be exercised after marriage was not valid, if exercised previously. Hodsden v. Lloyd, 2 Bro. C. C. 534, 29 Eng. Repr. 293 (1789). See also Doe v. Staple, 2 T. R. 684, 100 Eng. Repr. 368; Sugden, supra, 190. If the agreement was broad enough, it could be exercised before marriage, even before the execution of the antenuptial agreement. Thus in Taylor v. Rains, 7 Mod. 147, 87 Eng. Rep. 1155 (1702) a woman made a will before her marriage pursuant to an antenuptial agreement. It was held that while the will was not good as a will, it was good as an exercise of the power conferred on her. In Southby v. Stonehouse, 2 Ves. Sr. 610, 28 Eng. Repr. 389 (1755) it was held that such document, while not properly a will, had the effect and consequence of one. So, too, in Logan v. Bell, 1 C. B. 872, 135 Eng. Rep. 786 (1845) a will executed before marriage pursuant to such power was upheld. These cases were followed in Osgood v. Bliss, 141 Mass. 474, 55 Am. Rep. 488, and McMahon v. Allen, 4 E. D. Smith (N. Y.) 519. In Downs v. Timeron, 4 Russ. Ch. 334, 38 Eng. Repr. 831, and Bradish v. Gibbs, 3 Johns. Ch. (N. Y.) 523, a will executed after marriage pursuant to such power was upheld, the latter case containing a review of many of the previous cases.

These authorities seem to lead to the same result already reached, but from a somewhat different aspect. They seem to establish a positive common-law rule, if our induction and generalization is not at fault, that whether a woman's will, executed either before or during marriage, was valid or not, was a question of power. For the power requisite at common law, in so far as disposition of her own property is concerned, statutory power has been substituted. There is some difference (leaving out the point of birth of children). The right·

of control and the right of disposition during life might be limited at common law; it is absolute under the statute, except only in the case of a homestead. The right to dispose of it by will might be unlimited at common law; it is unlimited under the statute, except that under section 88-101, the husband has the option to take one-half or one-fourth of her property, depending on the circumstances, in spite of her will. Notwithstanding these differences, as the validity of the will depended at common law upon the measure of power, so it seems to be under the statute. And some of the cases already cited have partially based their holding that a woman's will is not revoked by her marriage alone on the common law rule, or exception, here mentioned. In re Ward's Will, supra; Hastings v. Day, supra; Roane v. Hollingshead, supra; Fellows v. Allen, supra.

Counsel for the objector strenuously argue that the original rule of the common law—namely, that a woman's will is revoked by her subsequent marriage alone—is the law of this state pursuant to section 26-101, Rev. St. 1931. We are not able to see the force of the argument. That section provides in brief that the common law of England of a general nature in force in 1607 is the law of this state except as it has been modified by judicial decisions, and except in so far as it is inconsistent with the law of this state. Both of these exceptions here mentioned apply in this case. The rule mentioned is, as we have shown, inconsistent with the statutes of this state. The common law is not exactly the common law of 1607. Many, and probably most of the rules of the common law of 1607, aside from equitable rules and aside from fundamental maxims, have been modified by judicial decisions. And that is true with the rule under discussion. Our statute (Sec. 26-101) does not state what are the judicial decisions to which reference is made. However, it is,

and has been, the constant practice of courts in common law jurisdictions to freely cite cases from other common-law courts, and we take it that the legislature had in mind the judicial decisions of all of the various jurisdictions. The cases may differ; one court may take one view, another another. Hence we cannot consider these various decisions as the law in this state, but as interpretations of the common law, and we are at liberty to adopt that interpretation which seems to be the best.

There are cases contrary to the conclusion at which we have arrived. Swan v. Hammond, 138 Mass. 45; Blodgett v. Moore, 141 Mass. 75; In re Topher's Estate, 12 N. M. 372, 78 Pac. 53; 61 L. R. A. 315; Colcord v. Conway, 40 Fla. 97, 23 So. 561. The Massachusetts court reluctantly followed the common law rule, notwithstanding the changed condition of women under modern statutes. The Florida case seems to be based on the theory that a husband is, under the statute, an heir to the wife, in case she dies intestate, and that she should not be permitted to deprive him of all such rights. So far as we can find, no statute made any provision for either husband and wife in case of a will. The contrary is true under the statutes of this state. The case of Morgan v. Ireland, 1 Idaho 786, relied on by the Florida case, which involved a man's will, seems to have been decided on the same theory as the Florida case, for the court stated that a man ought not to be able to deprive a wife of her rights under the statute, which had been granted her in lieu of dower. Some of the cases, including a few which involve the will of a man, hold that the mere fact that husband and wife are heirs to each other under the statute revokes a will made previous to a marriage, though no children are born, on the theory that at common law marriage followed by the birth of an heir revoked a will. It would be wrong, however, to lay too much stress upon the

word "heir." We should avoid verbalism. We must inquire into the reason back of the common law rule, and that was, of course, that the birth of a child would create a new moral obligation, not ordinarily in contemplation of the testator at the time of the execution of a will made previously to marriage, and for whom, ordinarily, no provision would be made thereby. The rule ceased, when the reasons therefor ceased. Thus a man's will was held not to be revoked by marriage alone, because the law made provision for the wife by way of dower. The same principle was applied in case of marriage and the birth of an heir. Thus it is stated in 68 C. J. 829: "It is well settled that a will is not revoked by subsequent marriage and birth of a child if provision is made for the wife and child by will," or otherwise. Applying the reason underlying the rule at common law in the case at bar, we find that our statute (section 88-101) makes provision for both husband and wife in case a will is made by either. Ordinarily, under that section, either of them, in case of death of the other, is entitled, notwithstanding the provisions of the will to the contrary, to take one-half of the estate of the deceased, thus supplying the provision contemplated at common law, and taking away all reasons for holding that a will is revoked by marriage alone.

Furthermore, there seems to be a special reason for the conclusion already stated in a case like that at bar. Section 88-101 provides that a married person "leaving surviving him or her a child or children by any previous marriage * * * and leaving surviving him or her no child of the fruit of the marriage existing at the time of the death of such married person * * * may by will to others than the surviving spouse dispose of not exceeding three-fourths of the property," as against the husband; but he has the right to take one-fourth of the property in such case. We take it, that whether

the will here mentioned is made before or after marriage makes no difference. The statute does not state that three-fourths must be given to the children of the previous marriage, but the legislature probably thought that it would be given to all or part of them. In any event, the legislature seems to have declared its policy that in the event above mentioned, the survivor shall not, as of course, be entitled to as much of the property of the deceased, as in other cases. If we held the will in the case at bar to be revoked, it would seem that we should go counter to the policy of the law thus established. We must hold, accordingly, that the will in question in this case was not revoked by her marriage to the objector as to the property which descends according to the laws of this state.

2. It is contended by the objector that the will in this case should not be admitted to probate in this state at this time; that it should first be offered for probate in the State of Colorado, where the deceased died. It is stated in 68 C. J. 937 that "primary probate of a will should be made in the place of the testator's domicile; that is where the testator was an inhabitant of the state at the time of his death." See also 68 C. J. 919-920. At times, courts have refused to admit a will to probate upon original proceedings in a state other than the testator's domicile, holding it to be discretionary with the court whether to admit it before it is admitted in the place of the domicile, or where it had already been admitted in the state of the domicile. In re Lannon's Estate, 130 Misc. 499, 223 N. Y. S. 777; Payne v. Payne, 239 Ky. 99; 39 S. W. (2d) 205; see also Rackemann v. Taylor, 204 Mass. 394, 90 N. E. 552. These and other cases go upon the theory that the more orderly procedure is that the will be first admitted to probate in the state of the domicile, and that it should be admitted in any other jurisdiction upon certified copies of the proceedings from such

state. And a few courts have held that it cannot be admitted in a foreign state in any other way. Chadwick's Case, 80 N. J. Eq. 471, 85 Atl. 266; Corning's Estate, 150 Mich. 474, 124 N. W. 514. The statutes of this state provide that a "will must be proved and letters testamentary or of administration granted * * * in the county in which any part of the estate may be, the decedent having died out of the state, and not a resident thereof at the time of his death," etc. Two cases in this state have referred to this provision: Bliler v. Boswell, 9 Wyo. 57, 59 Pac. 798; Rice v. Tilton, 14 Wyo. 101, 82 Pac. 577. But the point here raised was not before the court. It is held by the great weight of authority under like or similar statutory provision that a will may be admitted to probate in a state other than that of the domicile of the deceased, though it has never been admitted in the latter state; and that the admission to probate in the state of the domicile is not a condition precedent to the admission in another state where the deceased leaves real or personal property. Thomas Kay Woolen Mill Co. v. Sprague, 259 Fed. 338; Clayson v. Clayson, 26 Wash. 253, 66 Pac. 410; Rader v. Stubblefield, 43 Wash. 334, 86 Pac. 560, 10 Ann. Cas. 20; In re Clark's Estate, 148 Cal. 108, 82 Pac. 760, 1 L. R. A. N. S. 996; In re M'Cullough's Estate, 129 Misc. 113, 221 N. Y. S. 535 and New York cases cited; Walton v. Hall, 66 Vt. 455, 29 Atl. 803; Brown's Estate, 2 Pa. Dist. Ct. 730; Putnam v. Pitney, 45 Minn. 242, 47 N. W. 790; 11 L. R. A. 41; Jacque v. Horton, 76 Ala. 238; Knight v. Hollings, 73 N. H. 495, 63 Atl. 38; In re Holden's Estate, 1 A. (2d) 721; also reported in 119 A. L. R. 487 with a complete note on the subject and referring to additional cases. The rule here mentioned is approved by Beale, Conflict of Law, Section 469.2, and in the Restatement of Conflict of Law, Section 469 and note. We think that we should give this rule our adherence, although it may be that

the court has the right under particular circumstances not to admit a will until an opportunity has been given to have it admitted in the state of the domicile of the deceased, particularly if proceedings are already pending in the latter state. Sec. 469, Restatement, Conflict of Laws, comment C. No such special circumstances exist in this case. No such proceedings are pending. In fact, it seems that if it is correct that under the laws of Colorado the will here in question was revoked, it is altogether probable that it would never be admitted to probate in that state, for the courts of that state would probably decline to pass upon the point as to whether or not the will is effective as to real estate situated in this state, in view of the rule hereafter mentioned, that the effect of revocation by subsequent marriage alone depends, so far as real estate is concerned, upon the laws of this state, so that the decision of the Colorado courts upon that point would not be binding here. Sec. 470, Restatement, Conflict of Laws. And that seems to be the rule as to the effect of the validity of a will generally. Wharton, supra, pp. 1333, 1356; Woerner, infra, Sec. 168. The will involved herein should, accordingly, be admitted to probate in this case.

3. The property in this state consists of real property and of a bank deposit. The deceased at the time of her death was domiciled in the State of Colorado. Counsel for the appellants seem to think that, if the will is held not to be revoked and is admitted to probate in this state, it takes effect equally as to all the property, both real and personal, situated in this state, notwithstanding the domicile of the deceased in Colorado as above stated, and in which the law appears to be different from that in this state. But the contention is not correct, in the absence of a statute in this state changing the ordinary rule, and no such statute has been pointed out. It is stated in Wharton, Conflict of

Laws (3rd ed.) p. 1351, that "the question whether the marriage of the testatrix or the birth of a child subsequently to the execution of the will, revokes the same, depends upon the lex domicilii so far as personal property is concerned, and upon the lex rei sitae so far as real property is concerned." That rule has been adopted in the Restatement of the law on Conflict of Laws (sections 250 and 307) ; by Beale, Conflict of Laws, pp. 972, 1037, and in 11 Am. Jur. 484. According to Wharton the rule is general, not only in common-law countries, but in civil-law countries as well, and applies not only in connection with the revocation of a will, but in other matters as well. He traces the reasons. We think we should follow a rule thus universally adopted. The distribution of the real estate involved herein must, then, be made according to the laws of this state, and the distribution of the personal property according to the laws of Colorado, as interpreted by the courts of that state.

4. Counsel for the objector contend that the probate proceedings in this state are only for the limited purpose of passing title to the real estate situate in this state. That contention is apparently based upon the claim that the proceedings in this state cannot be other than ancillary and upon the rule that the distribution of personal estate must be according to the laws of Colorado. There is little argument on this direct point in the briefs, and we are not certain just what counsel claim in this connection. However, we have deemed it necessary to pass on it, in order not to leave it in confusion. The contention, if it is as broad as it seems, is not well founded upon either of the grounds mentioned.

In 21 Am. Jur. 847, it is stated that "ancillary or auxiliary administration is that which is granted in pursuance of the laws of a government other than that of the decedent's domicile for the due collection and

disposition of such personal property as the deceased left within the jurisdiction of that government." This definition leaves real estate out of consideration. In 24 C. J. 1110 is given a broader definition. It is there stated that "where different administrations are granted in different jurisdictions, that which is granted in the jurisdiction of decedent's last domicile is termed the principal (primary) or domiciliary administration, and any other administration granted in any other state or country is termed 'ancillary,' and that without regard to which is granted first." We see no reason why this distinction is not as good as any other, though we must not by the name alone determine the power of the court of the domiciliary administration and that of the ancillary administration, or the power of the executor or administrator in the domicile of the deceased and in some other state. Mr. Justice Story stated in Harvey v. Richards, 1 Mason 381, Fed. Cas. 6184:

"I have no objection to the terms 'principal' and 'auxiliary' as indicating a distinction in fact as to the objects of the different administrations; but we should guard ourselves against the conclusion that therefore there is a distinction in law as to the rights of the parties. There is no magic in words. Each of these administrations may be properly considered as a principal one, with reference to the limits of its exclusive authority; and each might under circumstances justly be deemed an auxiliary administration. If the bulk of the property, and all the heirs and legatees and creditors were here, and the foreign administration were only to recover a few inconsiderable claims, that would most correctly be denominated a mere auxiliary administration for the beneficial use of the parties here, although the domicile of the testator were abroad."

See also Rader v. Stubblefield, supra; Alaska Banking etc. Co. v. Noyes, 64 Wash. 672, 117 Pac. 492; 21 Am. Jur. 848.

It is, then a question of power. And an ancillary ex-

ecutor or administrator has, at least in the absence of a statute to the contrary, just as much power, for the purpose of administration, over the personal property situated in his state, as over real estate also so situated.

Every state has plenary jurisdiction and control of the property, real and personal, within its borders. This includes the devolution and the administration of the property of a deceased person. Wharton, supra, Sec. 605; Woerner, American Law of Administration (3rd ed.) 166; In re Holden's Estate, supra. This is subject to constitutional provisions which may at times arise, such as that of due process. See Farmer's Loan and Trust Co. v. Minnesota, 280 U. S. 204; Baldwin v. Missouri, 281 U. S. 586. A foreign representative of the estate of a deceased has no right to interfere with any such property, either by suit in this state or otherwise, except only as may be permitted by the state of the forum by statute or by the recognition of the rule of comity under the principles of conflict of laws. Wharton, supra, 604; Woerner, supra, Sec. 160; 21 Am. Jur. 855; 24 C. J. 1119-1121. If a debtor is located here,it is proper for the state to protect him, so that a payment once made by him will completely absolve him. If there are local creditors, the state should enable them to collect their debt out of property, real and personal, situate in this state. Wharton, supra, sections 606-607. It is sometimes stated that the domiciliary representative of a deceased is vested with the title to all personal property wherever situate. 21 Am. Jur. 854; Beale, Conflict of Laws, 1467-1469. But that does not enable him to sue for property in another jurisdiction, in the absence of a statute, and it does not apply at all if there is a local administration. Beale, supra, 1469; 21 Am. Jur. 855; 24 C. J. 1118-1120. On some questions the authorities are not altogether harmonious, for instance, whether a voluntary payment to a foreign representative is binding, and whether a

local representative may sue a local debtor on a negotiable instrument. The Restatement of Conflict of Laws has attempted to settle a number of these questions, and in favor of the principle of comity; that is, in favor of the domiciliary representative. But there appears to be no dispute on the point involved in this case. A bank deposit is a simple contractual debt. It appears to be well settled, at least in cases in which such debt is not evidenced by a separate and transferable document, that the administration of such debt, belongs to the representative of the deceased of the forum. It is stated in Wharton, supra, Sec. 612a, that "while for some purposes the situs of a simple contract debt is at the domicile of the creditor, its situs for the purpose of administration is at the domicile of the debtor rather than the domicile of the creditor." That is the holding in Rowley's Estate, 178 Wash. 460, 35 P. (2d) 34; Phillips v. Phillips, 213 Ala. 27, 104 So. 234; 21 Am. Jur. 402. In the case of Bliler v. Boswell, 9 Wyo. 57, 67, already mentioned, the court stated that "as to the money so on deposit, it would seem that a local administration would be necessary to invest the representative with complete authority to require its return or repayment from the bank." And so far as we have been able to ascertain, the authorities seem to agree with that statement. Thus Beale, supra, p. 1487, states that "a simple deposit in a bank is undoubtedly collectible by the administrator where the bank is, and it seems to belong to the estate in that state." And that was held to be the rule in Gregory v. Lansing, 115 Minn. 73, 131 N. W. 1010, and In re Lloyd's Estate (Wash.) 52 P. (2d) 1269. When the administration has been completed in this state, the amount of money, or other personal property remaining, must either be turned over to the administrator in Colorado, or must be distributed by the trial court herein directly to the heirs but in accordance with the

law of the State of Colorado. What course should be pursued cannot be decided until the time of the final settlement and distribution, when all the facts are known or made known. A full discussion of the subject is found in 21 Am. Jur. 866-870; 24 C. J. 1126-1128; note 90 A. L. R. 1055. It appears that a guardian of the minor children has been appointed in this state and has managed their property. If that is true, it would seem that the distribution should be made in this state, at least as to the portion belonging to the minors, unless other controlling factors require a different course.

The judgment of the trial court is reversed with direction to proceed in this matter not inconsistent with this opinion.

*Reversed with direction.*

RINER, Ch. J., and KIMBALL, J., concur.